UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-1893

LINAH JEROTICH TALLAM,

                    Petitioner,

          v.

ERIC H. HOLDER, JR., Attorney General,

                    Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued:  December 5, 2012          Decided:  March 13, 2013

Before WILKINSON, NIEMEYER, and GREGORY, Circuit Judges.

Petition denied by unpublished opinion.  Judge Niemeyer wrote
the opinion, in which Judge Wilkinson and Judge Gregory joined.

**ARGUED:**  William Payne, PAYNE & ASSOCIATES, Washington, D.C.,
for Petitioner.   Nicole J. Thomas-Dorris, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON
BRIEF:**  Tony West, Assistant Attorney General, Civil Division,
Jennifer L. Lightbody, Senior Litigation Counsel, UNITED STATES
DEPARTMENT OF JUSTICE, Office of Immigration Litigation,
Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Linah Jerotich Tallam, a native and citizen of Kenya, filed this petition for review of an order of the Board of Immigration Appeals ("BIA") dismissing her appeal from an immigration judge's order denying her application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The BIA agreed with the immigration judge that Tallam had not established her eligibility for relief. Because the record does not compel us to conclude otherwise, see INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992), we deny the petition for review.

I

Linah Tallam entered the United States in August 2001 on a student visa that authorized her to remain through the completion of her studies or, at the latest, December 13, 2007. In December 2007, as she was preparing to return to Kenya with her American daughter, the country erupted in ethnic violence following the presidential election, held on December 27, 2007. According to a March 2008 report by Human Rights Watch, the opposition candidate's one-million vote lead mysteriously disappeared as the final votes were being counted, and the incumbent candidate, Mwai Kibaki, a member of the Kikuyu tribe, was suddenly declared the winner on December 30, 2007. J.A.

2

196. After the results were announced, "[m]obilized opposition supporters -- especially in the Rift Valley and the slums of Nairobi -- attacked those whom they assumed had voted for Kibaki, and his [political party], in large part the Kikuyu. This assigned an ethnic dimension to the violence and angry Kikuyu then fought back." J.A. 178. "The scale and speed of the violence that engulfed Kenya following the controversial presidential election . . . shocked both Kenyans and the world at large. Two months of bloodshed left over 1,000 dead and up to 500,000 internally displaced persons . . . ." J.A. 176.

According to Tallam, her family was tragically affected by these events. Tallam states that she learned by phone from her brother Moses that members of the Kikuyu tribe had attacked all of the members of the Kalenjin tribe living in her home village of Benonin, which is located outside the town of Eldama Ravine in Kenya's Rift Valley in a predominately Kikuyu area. J.A. 130-32, 155, 296. Moses told her that on January 5, 2008, Kikuyu men burned down their mother's home, along with the nearby homes of two of their other brothers, causing their family to flee to other parts of Kenya. J.A. 296-97. She later found out from Moses that on February 14, 2008, members of the Kikuyu tribe murdered her sister Lydia and raped one of her cousins. J.A. 297.

Based on this information, on April 8, 2008, Tallam filed an application for asylum, withholding of removal, and relief under the CAT, claiming a fear of persecution on account of her membership in the Kalenjin tribe. An asylum officer declined to grant Tallam's application and instead referred it to the Immigration Court. The Department of Homeland Security subsequently initiated removal proceedings against Tallam, charging her with being subject to removal under 8 U.S.C. § 1227(a)(1)(B) for having overstayed her non-immigrant visa.

Appearing before an immigration judge in June 2009, Tallam conceded her removability but renewed her requests for asylum, withholding of removal, and CAT protection. Alternatively, she requested voluntary departure. After hearing Tallam's testimony and reviewing the documentary evidence submitted by both sides, the immigration judge denied Tallam's application. First, the judge ruled that Tallam's asylum application was time barred, as it was filed more than one year after she last entered the United States and neither of the exceptions that would excuse an untimely filing applied. After making this initial ruling, the judge proceeded to articulate an alternative, merits-based rationale for denying Tallam's application. Although the judge found Tallam's testimony credible and found that Tallam had a genuine subjective fear of persecution, the judge found that she had not demonstrated an objectively reasonable basis for that

4

fear. In this regard, the judge noted that the reports in the record on conditions in Kenya indicated that the acute period of election-related violence had ended. Moreover, the judge found, even though some inter-ethnic violence still existed in Kenya, Tallam had not demonstrated that she could not reasonably relocate within Kenya, especially given her testimony that many of her family members had relocated to other areas in Kenya and that two of her siblings had even returned to Eldama Ravine. The immigration judge also emphasized that the Kenyan government had made significant efforts to quell the country's inter-ethnic violence. Accordingly, the judge denied Tallam's requests for asylum, withholding of removal, and CAT protection, although the judge granted her alternative request for voluntary departure.

By order dated July 18, 2011, the BIA affirmed, finding that it need not decide whether Tallam's asylum application was timely filed because Tallam had not established a well-founded fear of future persecution on account of a protected ground. The BIA found that the "country condition evidence in the record shows that inter-ethnic violence carried out by various ethnic groups, including the Kalenjin, occurred for 2 months after the 2007 presidential election," but that the country's political parties had responded to the crisis by reaching a power-sharing agreement that also established a Commission of Inquiry on political violence, an Independent Review Committee on

elections, and a Truth, Justice, and Reconciliation Commission. The BIA also agreed with the immigration judge that Tallam had not met her burden of establishing that it would not be reasonable for her to relocate to another part of Kenya. Because she had not demonstrated her eligibility for asylum, the BIA additionally found Tallam could not satisfy the higher burden applicable to withholding of removal. Finally, the BIA agreed that Tallam had not shown that it was more likely than not that she would be tortured by the Kenyan government or with the government's consent or acquiescence and that she therefore did not qualify for CAT protection. The BIA accordingly dismissed Tallam's appeal and reinstated the period for her voluntary departure.

Tallam timely filed this petition for review of the BIA's decision.

II

The Immigration and Nationality Act authorizes the Attorney General to grant asylum to a person unable or unwilling to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); id. § 1158(b). The applicant "bear[s] the burden of proving eligibility for

6

asylum." Naizgi v. Gonzales, 455 F.3d 484, 486 (4th Cir. 2006). If the asylum applicant shows past persecution, she is presumed to have a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1). Without regard to past persecution, the applicant has a well-founded fear of persecution if (1) she "has a fear of persecution in . . . her country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion;" (2) "[t]here is a reasonable possibility of suffering such persecution if . . . she were to return to that country;" and (3) "she is unable or unwilling to return to, or avail . . . herself of the protection of, that country because of such fear." Id. § 1208.13(b)(2)(i). The well-founded fear standard therefore contains both subjective and objective components. The subjective element may be satisfied "by presenting candid, credible, and sincere testimony demonstrating a genuine fear of persecution," Chen v. INS, 195 F.3d 198, 201 (4th Cir. 1999) (internal quotation marks omitted), while the "objective element requires a showing of specific, concrete facts that would lead a reasonable person in like circumstances to fear persecution," Ngarurih v. Ashcroft, 371 F.3d 182, 187-88 (4th Cir. 2004).

To establish a well-founded fear of persecution, an asylum applicant need not show that she would be individually targeted for persecution if she establishes that "there is a pattern or

7

practice . . . of persecution of a group of persons similarly situated to the applicant." 8 C.F.R. § 1208.13(b)(2)(iii). In such a case, "[t]he key for the applicant is to show the thorough or systematic nature of the persecution he fears." Chen, 195 F.3d at 203. The applicant is ineligible for asylum, however, if she "could avoid persecution by relocating to another part of [her] country of nationality . . . [and] if under all the circumstances it would be reasonable to expect [her] to do so." 8 C.F.R. § 1208.13(b)(2)(ii). If the applicant has not established past persecution or that the feared persecution would be by a government or government-sponsored, the applicant "bear[s] the burden of establishing that it would not be reasonable for . . . her to relocate." Id. § 1208.13(b)(3)(i).

A determination of the BIA must be supported by substantial evidence, and we review its decision under a highly deferential standard. Under that standard, its factual determinations "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, we may reverse the BIA's findings only if the evidence presented was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 484; Ngarurih, 371 F.3d at 188. And "[t]he agency decision that an alien is not eligible for asylum is 'conclusive

8

unless manifestly contrary to the law and an abuse of discretion.'" Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010) (quoting 8 U.S.C. § 1252(b)(4)(D)).

Tallam argues that the BIA's determination that she is ineligible for asylum is not supported by substantial evidence. While she has never claimed to be the victim of past persecution, she contends that "the egregious behavior inflicted on her family by the Kikuyu tribe, unchecked by the government in conjunction with the country conditions of ethnic violence, gave her a well founded fear of persecution based on her social group." We conclude, however, that the record evidence, taken as a whole, does not compel the conclusion that Tallam had a well-founded fear of persecution in June 2009, when the immigration judge considered her asylum application. Instead, as the BIA found, both of the primary reports in the record on conditions in Kenya -- the U.S. Department of State 2007 Country Report on Human Rights Practices, dated March 11, 2008; and a March 2008 report by the Human Rights Watch entitled, "Ballots to Bullets: Organized Political Violence and Kenya's Crisis in Governance" -- indicate that the acute inter-ethnic violence that beset Kenya after the December 2007 election had largely ended by the spring of 2008.

Tallam attempts to controvert this conclusion with two pieces of evidence. First, she points to a U.N. News Service

article, dated October 24, 2008. But that article simply reports that a Deputy High Commissioner for Human Rights, when visiting Kenya, called for the nation's leaders "to address issues -- such as violations of socio-economic rights, land issues, large disparities between classes, marginalization and exclusion -- at the root of the [post-election] violence." J.A. 377. If anything, this article actually supports the agency's finding that the violence had largely subsided by the time the immigration judge considered Tallam's asylum application.

Tallam also points to her testimony that the week before her asylum hearing, she learned from her brother Moses that one of their neighbors had been killed. J.A. 144-45. Her brother did not have information regarding the circumstances of the neighbor's death, other than claiming that he "knew" that the neighbor had been killed by a member of the Kikuyu tribe because he had been decapitated. J.A. 145. But this isolated act of lingering inter-ethnic violence does not compel the conclusion that, at the time of the asylum hearing, there was "a pattern or practice" in Kenya of persecuting the Kalenjin based on their tribal membership so as to make Tallam's fear of persecution objectively reasonable. See 8 C.F.R. § 1208.13(b)(2)(iii); Chen, 195 F.3d at 203.

Additionally, Tallam completely fails to address the BIA's findings that the persecution she subjectively fears is neither

10

by the government nor government sponsored. In that circumstance, she "bear[s] the burden of establishing that it would not be reasonable for . . . her to relocate," 8 C.F.R. § 1208.13(b)(3)(i), a burden she failed to carry. As both the immigration judge and the BIA emphasized, Tallam's testimony suggests that her mother and her eight living siblings have all safely relocated within Kenya. J.A. 133-37, 146-48. Indeed, Tallam testified that two months before her asylum hearing, two of her siblings had returned to Eldama Ravine, apparently without incident. J.A. 136-37, 146-47. The record is also devoid of any recent affidavits or letters, from either Tallam's family members or other members of the Kalenjin tribe, reporting that the Kalenjin are still being persecuted by the Kikuyu.

For these reasons, we conclude that substantial evidence supports the BIA's affirmance of the immigration judge's denial of Tallam's application for asylum.

Turning to Tallam's request for withholding of removal under 8 U.S.C. § 1231(b)(3), such relief is only available to applicants who are "more likely than not" to face future persecution, a burden of proof more onerous than the well-founded fear standard for asylum. 8 C.F.R. § 1208.16(b)(2); see also Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004). Because we affirm the BIA's conclusion that Tallam failed to establish a well-founded fear of future persecution, it follows

11

that her proof also fails to establish her eligibility for withholding of removal.

Finally, we conclude that substantial evidence supports the BIA's denial of CAT relief. The evidence in the record does not compel the conclusion that Tallam will, more likely than not, be tortured by, or with the acquiescence of, Kenyan government officials, as is necessary to qualify for protection under the CAT. See 8 C.F.R. §§ 1208.16(c), 1208.18(a). Rather, the objective record evidence indicates that the Kenyan government has gone to significant lengths to respond to the severe inter-ethnic violence sparked by the December 2007 presidential election. There is simply nothing in the record that would compel a reasonable factfinder to agree with Tallam that government officials would, more likely than not, participate in, or be complicit in, the torture of a returning Kenyan citizen. We accordingly affirm the BIA's denial of Tallam's request for CAT protection.

For the foregoing reasons, we deny Tallam's petition for review.

PETITION DENIED

12